## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DUANE HENDERSON; and LINDA NUNN, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>     v.<br><br>CENTER FOR SCIENCE IN THE PUBLIC INTEREST,<br><br>                Defendant. | Case No. 1:22-cv-00856-HYJ-RSK<br><br>Hon. Hala Y. Jarbou<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Duane Henderson ("Plaintiff Henderson") and Linda Nunn ("Plaintiff Nunn") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1.      Defendant Center for Science in the Public Interest ("CSPI") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiffs' *Nutrition Action* healthletter subscriptions to data aggregators, data appenders, data cooperatives (including Wiland, Inc.), and list brokers, among others, which in turn

disclosed their information to aggressive advertisers, political organizations, and

non-profit companies. As a result, Plaintiffs have received a barrage of unwanted

junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiffs' Private

Reading Information (defined below) during the relevant pre-July 31, 2016 time

period[1], CSPI violated Michigan's Preservation of Personal Privacy Act, H.B. 5331,

84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B.

---

[1]    The statutory period for this action is six years, which is 2,190 days. *See* M.C.L. § 600.5813.

The applicable six-year limitation period was tolled for 101 days pursuant to Executive Orders issued by the Governor of Michigan during the COVID-19 pandemic. *See* Mich. Executive Order No. 2020-58 ("[A]ll deadlines applicable to the commencement of all civil and probate actions and proceedings, including but not limited to any deadline for filing an initial pleading . . . are suspended as of March 10, 2020 and shall be tolled until the end of the declared states of disaster and emergency.") (emphasis added); Mich. Supreme Court Administrative Order No. 2020-3 ("For all deadlines applicable to the commencement of all civil and probate case types, including but not limited to the deadline for the initial filing of a pleading . . . any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included.") (emphasis added); Mich. Executive Order No. 2020-122 (ending tolling period on June 20, 2020); Mich. Supreme Court Administrative Order No. 2020-18 (same); *see also Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999) (under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation"); *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983) ("Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal courts sitting in diversity.").

Thus, the applicable statutory period for this action is June 8, 2016 (2,291 days prior to the commencement of the instant action on September 16, 2022) through July 30, 2016.

4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

2.     Documented evidence confirms these facts.   For example, CSPI, through list broker NextMark, Inc. ("NextMark"), offers to provide renters access to its mailing list titled "NUTRITION ACTION HEALTHLETTER WILAND DIRECT MODELING MF Mailing List", which contains the Private Reading Information of all 296,055 of CSPI's active and recently expired U.S. subscribers at a base price of "$110.00/M [per thousand]," (i.e., 11 cents apiece), as shown in the screenshot below:

---

[2]     In May 2016, the Michigan legislature amended the PPPA.  *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date.  *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)).  Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).



# NUTRITION ACTION HEALTHLETTER WILAND DIRECT MODELING MF Mailing List

Nutrition Action Healthletter is a publication of the Center for Science in the Public Interest (CSPI). It provides unbiased nutritional, health and educational information for consumers in each issue. This newsletter covers topics such as food labeling, nutrition, food safety, product reviews, dietary supplements, exercise, diet-related diseases, and more. Additionally, each issue contains brand-name food ratings, nutrition news, and nutrition research. Nutrition Action Healthletter does not accept any corporate advertising in its newsletters.

**Get Count**  **Get Pricing**  **Get More Information**

| SEGMENTS | | COUNTS THROUGH 06/30/2022 |
|---|---|---|
| 296,055 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 296,055 | ACTIVE SUBSCRIBERS | $110.00/M |
| | WILAND SCORING FEE | + $35.00/M |
| | ($300/F MINIMUM SCORING) | |
| | FUNDRAISER RATE | $75.00/M |

| POPULARITY: ●●●●● 100 | |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | 📧 |
| SOURCE: | DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 56% FEMALE 31% MALE |
| SPENDING: | $24.00 AVERAGE ORDER |

**DESCRIPTION**

Nutrition Action Healthletter is a publication of the Center for Science in the Public Interest (CSPI). It provides unbiased nutritional, health and educational information for consumers in each issue. This newsletter covers topics such as food labeling, nutrition, food safety, product reviews, dietary supplements, exercise, diet-related diseases, and more. Additionally, each issue contains brand-name food ratings, nutrition news, and nutrition research. Nutrition Action Healthletter does not accept any corporate advertising in its newsletters.

Demographic Profile:
Average Age 70
Average Household Income $75,648

Through the Wiland modeling program, participants of this database have the opportunity to apply their house or prospecting model to Nutrition Action Healthletter in order to better target prospects. This can be utilized for new test opportunities or expansion activity on the file.

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $15.00/M |
| 12 MONTH HOTLINE | $5.00/M |
| 3 MONTH HOTLINE | $10.00/M |
| 6 MONTH HOTLINE | $8.00/M |
| GENDER/SEX | $8.00/M |
| NON RECIPROCAL | |
| SCF | $8.00/M |
| STATE | $8.00/M |
| WILAND SCORING | $35.00/M |
| ZIP | $8.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $3.00/M |
| EMAIL | $50.00/F |
| FTP | $50.00/F |

**RELATED LISTS**

- WILAND PUBLISHING/SUBSCRIBER DATABASE
- TUFTS UNIVERSITY HEALTH & NUTRITION LETTER
- TRUSTED MEDIA BRANDS - WILAND DIRECT MODELING
- UCLA HEALTHY YEARS
- PARALYZED VETERANS OF AMERICA WILAND MODELING
- NUTRITION ACTION HEALTHLETTER U.S. SUBSCRIBERS
- BELVOIR - WILAND DIRECT MODELING MASTERFILE
- ANNIE'S - WILAND MODELED SELECTIONS PROGRAM
- ALLIANT DIRECT AUDIENCES - MODELING
- THE WEEK MAGAZINE WILAND MODELING

**ORDERING INSTRUCTIONS**

- To order this list, contact your List Broker and ask for NextMark List ID #421186 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- $300.00 MINIMUM PAYMENT
- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($10.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE
- CANCELLATION FEE AT $150.00/F

*See* **Exhibit A** hereto.

3.　　The same or a substantially similar "data card" as the one shown above, with the same or similar rates and advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was

also publicly advertised by CSPI as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period – thus demonstrating that CSPI was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading Information (including Plaintiffs' and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period. Specifically, during the relevant pre-July 31, 2016 time period, CSPI published (on the websites of Nextmark and SRDS, Inc., another list broker, among other data broker's websites) a data card titled "Nutrition Action Healthletter Wiland Direct Modeling Masterfile", which advertised the availability of a Wiland-"enhanced" list containing the Private Reading Information of all of the 542,479 then-subscribers to its *Nutrition Action* healthletter, at a base price of $110.00/M per thousand, (i.e., 11 cents apiece).[3] During the relevant pre-July 31, 2016 time period, CSPI made the following statement, among others, on its "Nutrition Action Healthletter Wiland Direct Modeling Masterfile" data card: "Wiland Direct members can apply their models to the Nutrition Action file allowing them to reach their ideal target audience."

---

[3] This data card titled "Nutrition Action Healthletter Wiland Direct Modeling Masterfile" was accessible during the relevant pre-July 31, 2016 time period at http://www.srds.com/directnet/dnet?action=recoListDetail&mid=957589&unit=0, and was assigned the ID number 957589 by SRDS.

4.     The term "Wiland" (appearing in the title of the data card in effect throughout the relevant pre-July 31, 2016 time period) refers to Wiland, Inc. – a data cooperative and data appending company that offers, *inter alia*, list "enhancement" and "prospecting" services to its clients.  Wiland's clients, such as CSPI, use these services, and used these services during the relevant pre-July 31, 2016 time period, by transmitting their entire subscriber files to Wiland, who in turn "appends" additional demographic and personal data about each subscriber to the file, thereby "enhancing" it (i.e., making it more valuable, and allowing the publisher to rent its lists to third parties for more money and to exchange its lists to other third parties on more favorable terms), and also provides the publisher client with the Personal Reading Information of other individuals who are not existing subscribers to its publications but who fit certain pre-determined criteria that render them likely to be interested in purchasing subscriptions to its publications, i.e., "prospects" who the publisher then markets its publications to.  Plaintiffs are informed and believe, and thereupon allege, that, throughout the relevant pre-July 31, 2016 time period, CSPI (as a data "enhancement" and "prospecting" client of Wiland's) was contractually obligated to provide Wiland the Personal Reading Information of all of the subscribers (as well as all of the recently expired subscribers) to its *Nutrition Action* publication, on a periodic and regular basis (at least as frequently as once a month), which Wiland then used to facilitate its list enhancement and prospecting services.

Thus, because CSPI was a client of Wiland's throughout the relevant pre-July 31, 2016 time period (as evidenced by CSPI's advertising of its "Nutrition Action Healthletter Wiland Direct Modeling Masterfile" throughout that time period), CSPI necessarily transmitted all of its subscribers' Personal Reading Information (including Plaintiffs' and all Class members' Personal Reading Information) to Wiland on at least as frequently as a monthly basis over the same time period.

5.     Moreover, in CSPI's "Privacy Policy" in effect throughout the relevant pre-July 31, 2016 time period, accessible via hyperlink at the bottom of its website, CSPI admitted to "shar[ing]" its *Nutrition Action* subscriber "list . . . with other organizations." Center for Science in the Public Interest, "Privacy Policy Statement," version in effect on May 23, 2016, available in archived form at https://web.archive.org/web/20160523225207/http://www.cspinet.org:80/about/privacy_policy.html, a copy of which is attached hereto as **Exhibit B**.

6.     CSPI's publicly available audited financial statements from June 2016 – squarely within the relevant pre-July 31, 2016 time period – conclusively confirm the veracity of these factual allegations.  For the period ending June 30, 2016, CSPI reported that its "current assets" included "[$]84,307" attributable to "[l]ist rental receivable, net." Center for Science in the Public Interest, "Financial Statements and Independent Auditors' Report, June 30, 2016 and 2015," Matthews, Carter & Boyce, at p.2, available at https://www.cspinet.org/sites/default/files/attachment/CSPI%20

Financial%20Audit%20-%20FY2016.pdf, a copy of which is attached hereto as **Exhibit C**.

7.     The lists advertised for sale in the "data cards" referenced above in paragraphs 2 and 3 (and all of the other "data cards" advertised by CSPI between the commencement of the relevant pre-July 31, 2016 time period and the present) include, *inter alia*, the full names and addresses of each person who purchased a subscription to CSPI's *Nutrition Action* publication; indeed, the postal-mail envelope logo in the "channels" field of the data card (which appeared on all of the data cards referenced herein) indicates that the advertised mailing list contains the necessary information (i.e., name and address) for the renters, exchangers, and purchasers of the list to contact the subscribers whose information appears on it via postal mail.  And the Personal Reading Information contained on the mailing lists advertised in the data cards referenced herein originates, and throughout the relevant pre-July 31, 2016 time period originated, directly from CSPI prior to being disclosed to the renters, purchasers, and exchangers of this data.

8.     Thus, for the entire duration of the pre-July 31, 2016 time period, CSPI was continuously and systematically (at least as frequently as once a month) renting, selling, exchanging, and otherwise disclosing all of its customers' Private Reading Information (including Plaintiffs' and all Class members' Private Reading Information) to Wiland and numerous other third parties for appending,

enhancement, prospecting, and rental purposes.

9. As a result of CSPI's standard practice of systemically disclosing all of its subscribers' (including Plaintiffs' and all Class members') Private Reading Information to third parties during the relevant pre-July 31, 2016 time period, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes following their purchases of subscriptions to *Nutrition Action* over the same time period.

10. By renting, exchanging, or otherwise disclosing the Private Reading Information of all of its Michigan-based subscribers during the relevant pre-July 31, 2016 time period, CSPI violated the PPPA. Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

11. Accordingly, Plaintiffs bring this First Amended Class Action Complaint against CSPI for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the PPPA.

## NATURE OF THE CASE

12. To supplement its revenues, CSPI rents, exchanges, or otherwise discloses all of its customers' information—including their full names, titles of

9

publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as gender—to data aggregators, data appenders, data cooperatives (including Wiland, Inc.), and other third parties without the written consent of its customers. CSPI continuously engaged in these same practices (disclosing its entire database of its customers' Personal Reading Information to third parties, at least as frequently as once a month) since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period.

13.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, CSPI is able to disclose the information time and time again to countless third parties.

14.     CSPI's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

15.     While CSPI profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because CSPI does not obtain its customers' written consent prior to disclosing their Private Reading Information.

## PARTIES

16.    Plaintiff Henderson is a natural person and citizen of the State of Michigan and resides in Battle Creek, Michigan.   Plaintiff Henderson was a subscriber to *Nutrition Action* healthletter, including prior to July 31, 2016. *Nutrition Action* healthletter is published by CSPI.   While residing in, a citizen of, and present in Michigan, Plaintiff Henderson purchased his subscription to *Nutrition Action* healthletter directly from CSPI.   Prior to and at the time Plaintiff Henderson subscribed to *Nutrition Action*, CSPI did not notify Plaintiff Henderson that it discloses the Private Reading Information of its customers, and Plaintiff Henderson has never authorized CSPI to do so.   Furthermore, Plaintiff Henderson was never provided any written notice that CSPI rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out.   Since subscribing to *Nutrition Action*, and during the relevant pre-July 31, 2016 time period, CSPI disclosed, without the requisite consent or prior notice, Plaintiff Henderson's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files.   Moreover, during that same period, CSPI rented or exchanged mailing lists containing Plaintiff Henderson's Private Reading Information to third parties seeking to contact CSPI subscribers, without first obtaining the requisite written consent from Plaintiff Henderson or even giving him prior notice of the

rentals, exchanges, and/or other disclosures.

17.     Plaintiff Linda Nunn is a natural person and citizen of the State of Michigan and resides in Beulah, Michigan.  Plaintiff Nunn was a subscriber to *Nutrition Action* healthletter, including prior to July 31, 2016.  *Nutrition Action* healthletter is published by CSPI.  While residing in, a citizen of, and present in Michigan, Plaintiff Nunn purchased her subscription to *Nutrition Action* healthletter directly from CSPI.  Prior to and at the time Plaintiff Nunn subscribed to *Nutrition Action*, CSPI did not notify Plaintiff Nunn that it discloses the Private Reading Information of its customers, and Plaintiff Nunn has never authorized CSPI to do so. Furthermore, Plaintiff Nunn was never provided any written notice that CSPI rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out.  Since subscribing to *Nutrition Action*, and during the relevant pre-July 31, 2016 time period, CSPI disclosed, without the requisite consent or prior notice, Plaintiff Nunn's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files.  Moreover, during that same period, CSPI rented or exchanged mailing lists containing Plaintiff Nunn's Private Reading Information to third parties seeking to contact CSPI subscribers, without first obtaining the requisite written consent from Plaintiff Nunn or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

18.     Defendant Center for Science in the Public Interest is a Washington D.C corporation with its headquarters and principal place of business in Washington D.C.  CSPI does business throughout Michigan and the entire United States.  CSPI is the publisher of various healthletters and other publications, including *Nutrition Action*.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

20.     The Court has personal jurisdiction over CSPI because Plaintiffs' claims arose in substantial part from actions and omissions in Michigan, including from Plaintiffs' purchases of *Nutrition Action* subscriptions in Michigan, CSPI's direction of such *Nutrition Action* subscriptions into Michigan, and CSPI's failure to obtain Plaintiffs' written consent in Michigan prior to disclosing their Private Reading Information, including their residential addresses in Michigan, to another person, the effects of which were felt from within Michigan by citizens and residents of Michigan.  Personal jurisdiction also exists over CSPI in Michigan because CSPI conducts substantial business within Michigan, such that CSPI has significant,

continuous, and pervasive contacts with the State of Michigan.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiffs reside in this judicial District, CSPI does substantial business in this judicial District, CSPI is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

22.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

23.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

24.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

25.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

26.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

27.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our

15

interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

28.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit D**).

29.     Despite the fact that thousands of Michigan residents subscribe to CSPI's publications, CSPI disregarded its legal responsibility by systematically violating the PPPA.

### The Private Information Market:
### Consumers' Private Information Has Real Value

30.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[4]

---

[4]     **Exhibit E**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at*

31.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[5]

32.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[6]

33.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive"

---

https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

[5]     *See* **Exhibit F**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited July 30, 2021).

[6]     **Exhibit G**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

information in an open and largely unregulated market.[7]

34.      The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[8]

35.      Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[9]

36.      Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive

---

[7]      *See* **Exhibit H**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[8]      **Exhibit I**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[9]      **Exhibit J**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

collections of consumer data.[10]

37.    In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[11]

38.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[12] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like CSPI share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of

---

[10]    *See* **Exhibit K**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[11]    *Id.*

[12]    *See* **Exhibit L**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

fraudulent telemarketers" and other criminals.[13]

39.    Information disclosures like those made by CSPI are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[14] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[15] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

40.    Thus, information disclosures like CSPI's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[16]

---

[13]    **Exhibit M**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/ business/20tele.html (last visited July 30, 2021).

[14]    *Id.*

[15]    **Exhibit N**, *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

[16]    *See id.*

41.     CSPI is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

42.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

43.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

44.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[17] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[18]

---

[17]     *See* **Exhibit O**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_Consumer Confidence Report_US1.pdf (last visited July 30, 2021).

[18]     *Id.*

45.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

46.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[19]

47.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace:   consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[20]

---

[19]     *See* **Exhibit P**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[20]     *See* **Exhibit Q**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011), cited in European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

48.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[21]

### *CSPI Unlawfully Rents, Exchanges, and Discloses Its Customers' Private Reading Information*

49.     CSPI maintains a vast digital database comprised of its customers' Private Reading Information.  CSPI discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each CSPI customer, including his or her gender.  (*See, e.g.*, **Exhibit A**).

50.     CSPI then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular healthletters, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts.  (*See* **Exhibit A**).

---

[21]     *See* **Exhibit R**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy.  It is obvious that people value online privacy.").

51.     CSPI also discloses its customers' Private Reading Information to data cooperatives, who in turn give CSPI access to their own mailing list databases.

52.     As a result of CSPI's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from CSPI that identify CSPI's customers by their most intimate details such as their gender.  CSPI's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

53.     CSPI does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive information is being rented and exchanged on the open market.

54.     During the relevant pre-July 31, 2016 time period, consumers purchased subscriptions to CSPI's publications through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribed, CSPI never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre-July 31, 2016 time period, CSPI uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading Information.

55.     As a result, CSPI disclosed its customers' Private Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[22] – to anybody willing to pay for it.

56.     By and through these actions, CSPI has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

57.     Plaintiffs seek to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by CSPI without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

58.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication

---

[22]     **Exhibit S**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

through the distribution records of Defendant.

59.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.   Common legal and factual questions include, but are not limited to: (a) whether CSPI is a "retailer or distributor" of publications (*i.e.*, healthletters); (b) whether CSPI obtained consent before disclosing to third parties Plaintiffs' and the Class's Private Reading Information; and (c) whether CSPI's disclosure of Plaintiffs' and the Class's Private Reading Information violated the PPPA.

60.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiffs' and the Class's Private Reading Information.

61.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

62.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class

member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
**Violation of Michigan's Preservation of Personal Privacy Act**
**(PPPA § 2)**

63. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

64. Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant CSPI.

65. As a healthletter publisher that sells subscriptions to consumers, CSPI is engaged in the business of selling written materials at retail. *See* PPPA § 2.

66.     By purchasing subscriptions to *Nutrition Action* healthletter, Plaintiffs purchased written materials directly from CSPI.  *See* PPPA § 2.

67.     Because Plaintiffs purchased written materials directly from CSPI, they are each a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

68.     At various times during the pre-July 31, 2016 time period, CSPI disclosed Plaintiffs' Private Reading Information, which identified them as *Nutrition Action* customers, in at least three ways.

69.     First, CSPI disclosed mailing lists containing Plaintiffs' Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to CSPI.

70.     Second, CSPI disclosed mailing lists containing Plaintiffs' Private Reading Information to data cooperatives, who in turn gave CSPI access to their own mailing list databases.

71.     Third, CSPI rented and/or exchanged its mailing lists containing Plaintiffs' Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

72.     Because the mailing lists included the additional information from the

data aggregators and appenders, the lists were more valuable, and CSPI was able to increase its profits gained from the mailing list rentals and/or exchanges.

73.     By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, CSPI disclosed to persons other than Plaintiffs records or information concerning their purchases of written materials from CSPI.  *See* PPPA § 2.

74.     The information CSPI disclosed indicates Plaintiffs' names and addresses, as well as the fact that they subscribed to *Nutrition Action*.  Accordingly, the records or information disclosed by CSPI indicated Plaintiffs' identities.  *See* PPPA § 2.

75.     Plaintiffs and the members of the Class never consented to CSPI disclosing their Private Reading Information to anyone.

76.     Worse yet, Plaintiffs and the members of the Class did not receive notice before CSPI disclosed their Private Reading Information to third parties.

77.     CSPI's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

78.     CSPI's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their subscriptions.

79.    CSPI's disclosures of Plaintiffs' Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase CSPI's revenue.  Accordingly, CSPI's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

80.    By disclosing Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, CSPI violated Plaintiffs' and the Class's statutorily protected right to privacy in their reading habits.  *See* PPPA § 2.

81.    As a result of CSPI's unlawful disclosure of their Private Reading Information, Plaintiffs and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA).   On behalf of themselves and the Class, Plaintiffs seek: (1) $5,000.00 to each of the Plaintiffs and each Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.     For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act;

C.     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.     For an award of $5,000 to each of the Plaintiffs and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.     For prejudgment interest on all amounts awarded; and

F.     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: December 27, 2022       Respectfully submitted,

**DUANE HENDERSON & LINDA NUNN,**

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue

New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 27, 2022, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

<div style="margin-left: 40%;">

*/s/ E. Powell Miller*

E. Powell Miller (P39487)

**THE MILLER LAW FIRM, P.C.**

950 W. University Dr., Ste. 300

Rochester, MI 48307

Tel: (248) 841-2200

epm@millerlawpc.com

</div>